## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| MARIA H. RODRIGUEZ, | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. H-05-3820 |
| | § | |
| MICHAEL J. ASTRUE, | § | |
| COMMISSIONER OF SOCIAL | § | |
| SECURITY, | § | |
| Defendant. | § | |

## MEMORANDUM AND RECOMMENDATION ON
## MOTIONS FOR SUMMARY JUDGMENT

This matter was referred by United States District Judge Lee H. Rosenthal, for full pre-trial

management, pursuant to 28 U.S.C. § 636(b)(1)(A) and (B). (Docket Entry #3). Cross-motions for

summary judgment have been filed by Plaintiff Maria Rodriguez ("Plaintiff," "Rodriguez") and by

Defendant Michael J. Astrue[1] ("Defendant," "Commissioner"), in his capacity as Commissioner of

the Social Security Administration ("SSA"). (Plaintiff's Motion and Memorandum for Summary

Judgment ["Plaintiff's Motion"], Docket Entry #13; Defendant's Cross Motion and Memorandum

for Summary Judgment ["Defendant's Motion"], Docket Entry #12). Each party has also filed a

response to the competing motions. (Plaintiff's Response, Docket Entry #14; Defendant's Response,

Docket Entry # 15). After considering the pleadings, the evidence submitted, and the applicable law,

it is RECOMMENDED that Defendant's motion be GRANTED, and that Plaintiff's motion be

DENIED.

---

[1] On February 12, 2007, Michael J. Astrue became the Commissioner of Social Security. As provided in Rule 25(d)(1) of the Federal Rules of Civil Procedure, Mr. Astrue is automatically substituted for Jo Anne B. Barnhart as the defendant in this action. *See* 42 U.S.C. § 405(g); *see also ACLU of Miss., Inc. v. Finch*, 638 F.2d 1336, 1340 (5th Cir. 1981).

**Background**

On June 14, 2002, Plaintiff Maria Rodriguez filed applications for both Social Security Disability Insurance Benefits ("DIB"), under Title II of the Social Security Act ("the Act"), and for Supplemental Security Insurance ("SSI") benefits, under Title XVI of the Act.[2] (Plaintiff's Motion at 1; Transcript ["Tr."] at 57, 292). In her applications, Rodriguez claimed that she had been unable to work since February 9, 2002, due to degenerative disk disease,[3] glaucoma,[4] a fracture of the wrist, constipation, a hearing loss, and depression. (*See* Plaintiff's Motion at 1-2). After her original application was denied, Rodriguez was permitted to supplement it with additional information. (Tr. at 107-35). However, on November 3, 2003, the SSA decided that Rodriguez is not disabled under the Act, and so the applications were denied again. (Tr. at 23, 306). Plaintiff petitioned, unsuccessfully, for a reconsideration of those decisions. (Tr. at 24, 307). She then requested a hearing before an administrative law judge ("ALJ"). (Tr. at 46-47). That hearing took place on May 17, 2005, before ALJ Lantz McClain. (Tr. at 317). Plaintiff appeared and testified at the hearing, and she was accompanied by her attorney, Michael Makris ("Mr. Makris"). (*Id.*). In addition to Rodriguez, the ALJ also heard testimony from Byron Pettingill ("Mr. Pettingill"), a vocational expert witness. (*Id.*).

---

[2] While the rules governing DIB and SSI differ, an applicant seeking either benefit must first prove that she is "disabled" within the meaning of the Act. *See* 42 U.S.C. §§ 423(d), 1382c(a)(3) and (a)(3)(G); 20 C.F.R. §§ 404.1505(a), 416.905(a); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994). Rodriguez was eligible to receive DIB payments only through December 31, 2006. (Tr. at 16).

[3] "Degenerative disk disease" is characterized by deterioration of an intervertebral disk. MOSBY'S MEDICAL, NURSING, & ALLIED HEALTH DICTIONARY 453, 498 (5th ed. 1998).

[4] "Glaucoma" is "an abnormal condition of elevated pressure within an eye caused by obstruction of the outflow of aqueous humor." *Id.* at 693. "Aqueous humor" is "the clear, watery fluid circulating in the anterior and posterior chambers of the eye." *Id.* at 119.

On July 13, 2005, the ALJ engaged in the following five-step, sequential analysis to determine whether Plaintiff was capable of performing substantial gainful activity or was, in fact, disabled:

1.    An individual who is working or engaging in substantial gainful activity will not be found disabled regardless of the medical findings.   20 C.F.R. §§ 404.1520(b) and 416.920(b).

2.    An individual who does not have a "severe impairment" will not be found to be disabled.   20 C.F.R. §§ 404.1520(c) and 416.920(c).

3.    An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will not be considered disabled without consideration of vocational factors.   20 C.F.R. §§ 404.1520(d) and 416.920(d).

4.    If an individual is capable of performing the work she has done in the past, a finding of "not disabled" must be made.   20 C.F.R. §§ 404.1520(e) and 416.920(e).

5.    If an individual's impairment precludes performance of her past work, then other factors, including age, education, past work experience, and residual functional capacity must be considered to determine if any work can be performed.   20 C.F.R. §§ 404.1520(f) and 416.920(f).

*Newton v. Apfel*, 209 F.3d 448, 453 (5th Cir. 2000); *Martinez v. Chater*, 64 F.3d 172, 173-74 (5th Cir. 1995); *Muse v. Sullivan*, 925 F.2d 785, 789 (5th Cir. 1991); *Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991); *Harrell v. Bowen*, 862 F.2d 471, 475 (5th Cir. 1988).   It is well-settled that, under this analysis, Rodriguez has the burden to prove any disability that is relevant to the first four steps. *See Wren*, 925 F.2d at 125.   If she is successful, the burden then shifts to the Commissioner, at step five, to show that she is able to perform other work that exists in the national economy.   *See Myers v. Apfel*, 238 F.3d 617, 619 (5th Cir. 2001); *Wren*, 925 F.2d at 125.   "A finding that a claimant is disabled or is not disabled at any point in the five-step review is conclusive and terminates the analysis."   *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

It must be emphasized that the mere presence of an impairment does not necessarily establish a disability. *See Anthony v. Sullivan*, 954 F.2d 289, 293 (5th Cir. 1992) (quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)). An individual claiming disability insurance benefits under the Act has the burden to prove that she suffers from a disability. *See Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *Cook v. Heckler*, 750 F.2d 391, 393 (5th Cir. 1985). Under the Act, a claimant is deemed disabled only if she demonstrates an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death, or which has lasted or can be expected to last for a continuous period of not less than twelve months." *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (citing 42 U.S.C. § 423(d)(1)(A)). Substantial gainful activity is defined as "work activity involving significant physical or mental abilities for pay or profit." *Newton*, 209 F.3d at 452. A physical or mental impairment is "an impairment that results from anatomical, physiological or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." *Hames v. Heckler*, 707 F.2d 162, 165 (5th Cir. 1983) (citing 42 U.S.C. § 423(d)(3)). Further, the impairment must be so severe as to limit the claimant so that "she is not only unable to do her previous work but cannot, considering her age, education, and work experience, engage in any kind of substantial gainful work which exists in the national economy." *Greenspan*, 38 F.3d at 236 (citing 42 U.S.C. § 423(d)(2)(A)).

Based on these principles, as well as his review of the evidence presented at the hearing, the ALJ determined that Plaintiff suffers from glaucoma and degenerative disk disease. (Tr. at 20). Although he determined that these impairments, alone and in combination, are severe, he concluded, ultimately, that they do not meet, or equal in severity, the medical criteria for any disabling

impairment in the applicable SSA regulations.  (Tr. at 17-18).  The ALJ then assessed Rodriguez's

residual functional capacity, and found that she was not precluded from a return to her previous work

as a line server, a fast food worker, and a food assembler.  (Tr. at 21).  He concluded that, because

she can return to her previous work, Rodriguez was "not under a 'disability,' as defined in the Social

Security Act, at any time through the date of this decision."  (*Id.*).  He then denied her applications

for benefits.  (*Id.*).

On August 30, 2005, Plaintiff requested an Appeals Council review of the ALJ's decision.

(Tr. at 12).  SSA regulations provide that the Appeals Council will grant a request for a review if any

of the following circumstances is present:  "(1) there is an apparent abuse of discretion by the ALJ;

(2) an error of law has been made; (3) the ALJ's action, findings, or conclusions are not supported

by substantial evidence; or (4) there is a broad policy issue which may affect the public interest."  20

C.F.R. §§ 404.970 and 416.1470.  On October 14, 2005, the Appeals Council denied Plaintiff's

request, concluding that no reason for review existed under the regulations.  (Tr. at 7).  With that

ruling, the ALJ's findings became final.  *See* 20 C.F.R. §§ 404.984(b)(2) and 416.1484(b)(2).  On

November 9, 2005, Plaintiff filed this lawsuit, pursuant to section 205(g) of the Act (codified as

amended at 42 U.S.C. § 405(g)), to challenge that decision.  (Plaintiff's Original Complaint

["Complaint"], Docket Entry #1).  Subsequently, the parties filed cross-motions for summary

judgment.  Having considered the pleadings, the evidence submitted, and the applicable law, it is

recommended that Defendant's motion for summary judgment be granted, and that Plaintiff's motion

be denied.

**Standard of Review**

Federal courts review the Commissioner's denial of disability benefits only to ascertain whether the final decision is supported by substantial evidence and whether the proper legal standards were applied. *See Newton*, 209 F.3d at 452 (citing *Brown v. Apfel*, 192 F.3d 492, 496 (5th Cir. 1999)). "If the Commissioner's findings are supported by substantial evidence, they must be affirmed." *Id.* (citing *Martinez*, 64 F.3d at 173). "Substantial evidence is such relevant evidence as a reasonable mind might accept to support a conclusion. It is more than a mere scintilla and less than a preponderance." *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *see Martinez*, 64 F.3d at 173 (quoting *Villa v. Sullivan*, 895 F.2d 1019, 1021-22 (5th Cir. 1990)). On review, the court does not "reweigh the evidence, but . . . only scrutinize[s] the record to determine whether it contains substantial evidence to support the Commissioner's decision." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *see Fraga v. Bowen*, 810 F.2d 1296, 1302 (5th Cir. 1987). In making this determination, the court must weigh the following four factors: the objective medical facts; the diagnoses and opinions from treating physicians on subsidiary questions of fact; Plaintiff's own testimony about her pain; and Plaintiff's educational background, work history, and present age. *See Wren*, 925 F.2d at 126. If no credible evidentiary choices or medical findings exist that support the Commissioner's decision, then a finding of no substantial evidence is proper. *See Johnson*, 864 F.2d at 343.

**Discussion**

In her lawsuit, Plaintiff claims that she became disabled on February 9, 2002, due to degenerative disk disease, glaucoma, a wrist fracture, constipation, hearing loss, and depression or a mood disorder. (*See* Plaintiff's Motion at 1-2). She asks this court to reverse the Commissioner's

6

decision to deny her disability benefits, and to render a judgment in her favor, for numerous reasons. First, Rodriguez claims that the ALJ erred because he failed to give adequate consideration to the fact that she suffers from a pronounced loss in her field of vision, "either as to its severity or its functional implications." (*Id.* at 4).  Next, she claims, generally, that "[t]he ALJ erred in failing properly to develop the case with regard to Plaintiff's visual impairment." (*Id.*).  In particular, she argues that the ALJ should have ordered a more recent ophthalmologic examination to supplement the medical evidence before him. (*Id.* at 6).  Rodriguez also contends that the ALJ should have found that both her wrist and her mental impairments were severe. (*Id.* at 8).  In addition, Rodriguez claims that the ALJ erred by failing to analyze the functional limitations that accompany her other impairments, even if they are not severe. (*Id.* at 7).  Further, she argues that the ALJ failed to pose to the vocational expert witness a complete hypothetical question that included all of her medically determinable impairments. (*Id.* at 7-8).  In sum, Rodriguez argues that, because the ALJ's decision is not supported by substantial evidence and the proper legal standards were not applied, she is entitled to an award of benefits or, at the least, a remand of her case. (*Id.* at 1).  Defendant insists, however, that the ALJ properly considered all of the available evidence, and followed the applicable law, in determining that Plaintiff is not disabled. (Defendant's Response at 5).

### *Medical Facts, Opinions, and Diagnoses*

The earliest medical record shows that, on January 27, 1989, Rodriguez was admitted to Ben Taub General Hospital ("Ben Taub"), for an evaluation of an eight centimeter "rectal polyp/mass," and to rule out rectal cancer. (Tr. at 137, 145).  While in the hospital, Rodriguez underwent a proctoscopy, which the subsequent biopsy revealed to be "a moderate chronic inflammation and a couple of lymphoid follicles." (Tr. at 138, 159).  The biopsy also detected areas suspected to be

micro-abscesses, but the final diagnosis was chronic inflammation.  (Tr. at 159).  On February 1,

1989, Rodriguez "was discharged to home on no medications."  (Tr. at 138, 141).

The next record, dated May 22, 2000, is from the emergency room at Bayshore Medical

Center.  (Tr. at 160).  On that day, Rodriguez sought treatment for an allergic reaction to an anti-

inflammatory drug, including an itchy rash, swollen face, and a tight feeling in her throat.  (Tr. at

162).  She was discharged the same day with instructions to rest, to take Benadryl for three days, and

to follow up with her primary care physician, Dr. Ramon Pineda ("Dr. Pineda").  (Tr. at 160, 167).

On April 3, 2001, Rodriguez was evaluated by Dr. Terrence Riley ("Dr. Riley"), a neurologist

with the Harris County Hospital District ("HCHD").  (Tr. at 274).  Dr. Riley diagnosed Rodriguez

as suffering from "myasthenia gravis,"[5] a neurological disorder.  (*Id.*).  He determined that she was

capable of working 25 hours a week, with restrictions.  (*Id.*).  He found that Rodriguez could sit and

operate a keyboard for six hours in a work day, and could walk or stand for two hours.  (*Id.*).  He

also found that Rodriguez could do little or no climbing, kneeling, bending, pushing, or pulling, nor

could she lift or carry objects which weigh more than five pounds.  (*Id.*).  Dr. Riley did, however,

report that Rodriguez was capable of non-strenuous work in an office setting, such as answering

phones or filing.  (*Id.*).  On a second report,[6] Dr. Riley again cited myasthenia gravis, and imposed

similar restrictions on Rodriguez's ability to work.  (Tr. at 273).

On December 11, 2001, Rodriguez was treated by Dr. Ramon Pineda, her primary physician,

after she fell and hurt her right arm.  (Tr. at 217).  Dr. Pineda determined that Rodriguez had

---

[5] "Myasthenia gravis" is defined as "an abnormal condition characterized by chronic fatigability and muscle
weakness, especially in the face and throat, as a result of a defect in the condition of nerve impulses at the myoneural
junction."  *Id.* at 1065.

[6] The date on the record is not legible.

fractured her right wrist, and he prescribed pain relief medications.  (*Id.*).  Rodriguez returned for several follow-up examinations that month, all of which showed  that her condition had improved. (Tr. at 214-16).  In the last of these, dated December 21, 2001, Dr. Pineda noted that Rodriguez had a good range of motion in her right hand.  (Tr. at 214).  Two years later, on October 17, 2003, Rodriguez returned to Dr. Pineda, who ordered new x-rays of her right arm.  (Tr. at 213).  These x-rays apparently did not reveal any significant problems, but the handwritten report is difficult to decipher.  (*Id.*).  It is unquestionable, however, that Dr. Pineda reported that Rodriguez maintained a good range of motion in her right hand.  (*Id.*).

On September 25, 2002, Rodriguez was examined by Dr. Durga Sunkara ("Dr. Sunkara"), an internist, on behalf of the state.  (Tr. at 171).  In her report, Dr. Sunkara wrote:

> Patient complains of constipation: chronic—no etiological diagnosis made.  She says no cause was given to her by her doctor.  She says she has "kidney problems," by which she means she has back pain all the time and give [sic] very vague history with no specifics.  She denies any injury, hematurea[7] or fever.  In rt. wrist:  She complains of pain in rt. wrist.  She has history of fall in 12/01 and did [sic] not afford a cast, had a brace and it hurts now to lift or carry.

(*Id.*).  Dr. Sunkara also noted that Rodriguez suffered from ear infections and allergies.  (*Id.*). Following her examination, and a review of x-rays taken on the same date, Dr. Sunkara assessed Plaintiff's condition as follows:

> [Rodriguez] could sit, stand and move about.  She could lift, carry and handle objects with right [wrist] but with pain.  Her hearing and speech are normal.  There is no end organ damage in eyes, kidneys or heart.  She complains of a pain level of 5/10 in rt. wrist with weight lifting and it corresponds with her history and x-ray.  ROM [range of movement] normal in wrists.  Her gait is normal and she had no problems in toe and heel walking.  There is no loss of motion in hands.  Her weight-bearing status is good.  She could ambulate effectively without assistive devices.  His [sic] grip strength is 4/5 on right and her ability to reach, handle, finger and feel are preserved.

---

[7] "Hematurea" refers to the "abnormal presence of blood in the urine."  Mosby's at 742.

(Tr. at 172).

On October 10, 2002, Dr. M. Dolan ("Dr. Dolan") made an assessment of Rodriguez's physical residual functional capacity ("RFC"), after reviewing all of the available medical evidence. (Tr. at 174-81). Dr. Dolan made a primary diagnosis of post-traumatic wrist pain. (Tr. at 174). But he found that Rodriguez could lift 50 pounds occasionally, could lift 25 pounds frequently, and could sit, stand, or walk for six hours in an eight hour work day. (Tr. at 174-75). He also found that she could push or pull without any restrictions, but that she could stoop or crouch only occasionally. (Tr. at 175-76). Dr. Dolan found no evidence that Rodriguez had any manipulative, visual, communicative, or environmental limitations. (Tr. at 177-78). He did note, however, that Rodriguez's allegations of disability were "partially supported" by the record. (Tr. at 179). As to her complaints of wrist pain, Dr. Dolan found that Rodriguez had a 4/5 grip on rt," and "intact reach, handle, finger, feel." (Tr. at 181).

On November 25, 2002, Dr. B. Clyde Halley ("Dr. Halley"), an orthopedic surgeon, reviewed Dr. Dolan's assessment. (Tr. at 182-84). Dr. Halley expressed disagreement with Dr. Dolan's finding that Rodriguez had postural limitations on her ability to stoop or crouch. (Tr. at 182). He concluded that there was no objective evidence to support that finding, although he agreed with the remainder of the RFC assessment. (Tr. at 182-83). On January 6, 2003, based on Dr. Halley's opinion, an amended RFC assessment was issued which eliminated any postural limitations on Rodriguez's ability to work. (Tr. at 187-94, 195-96).

On March 4, 2003, Rodriguez was referred to an ophthalmologist after a visual field test revealed signs of glaucoma. (Tr. at 226, 230). On April 16, 2003, Rodriguez underwent a series of tests conducted by Charles Garcia ("Dr. Garcia"), an ophthalmologist. (Tr. at 198-208). These

10

records are not entirely legible, but they do reflect that Rodriguez was diagnosed as suffering from glaucoma. (*Id.*). On July 2, 2003, however, at a follow-up appointment, Dr. Garcia also reported that Rodriguez had a "moderate cataract,"[8] and that her vision had worsened in the three months since her last visit. (Tr. at 198).

On September 2, 2003, Rodriguez went to the HCHD's Strawberry Community Health Center, and complained of hearing loss in both ears and of a "stuffy head." (Tr. at 235). She was examined by Dr. P. Dwyer ("Dr. Dwyer"), who found a buildup of earwax and recommended that she consult an ear, nose, and throat doctor. (*Id.*). On November 3, 2003, Rodriguez returned to the clinic, complaining about constipation and insomnia. (Tr. at 234). She was given medication for her constipation and urged to exercise. (*Id.*). She returned to the clinic on January 6, 2004, for an annual examination, and it was noted, in her chart, that she wore glasses to correct her vision. (Tr. at 232). On March 9, 2004, Rodriguez returned to the clinic, complaining of eye and ear problems, including tinnitus[9] in her ear that had persisted for more than six months, as well as stomach pain. (Tr. at 232, 283). On this report, the treating physician noted that Rodriguez also complained of difficulty sleeping and crying spells. (Tr. at 283). Rodriguez was diagnosed as suffering from tinnitus, constipation, and depression, and she was prescribed medications for each of these conditions. (*Id.*). On April 1, 2004, Rodriguez returned for a follow-up appointment with Dr. Haleema Latifi ("Dr. Latifi"), a family practitioner. (Tr. at 280). Rodriguez complained of nasal congestion and sneezing. (*Id.*). Dr. Latifi diagnosed Rodriguez as suffering from allergic rhinitis, tinnitus, and controlled

---

[8] A "cataract" is "an abnormal progressive condition of the lens of the eye, characterized by loss of transparency." *Id.* at 282.

[9] "Tinnitus" is "a subjective noise sensation, often described as ringing, heard in one or both ears." *Id.* at 1621.

constipation.  (*Id.*).  She also noted some signs of depression and insomnia, but reported that Rodriguez refused medications to treat these conditions.  (*Id.*).  On September 9, 2004, Rodriguez saw Dr. Latifi again, and that day she complained of dizziness and an elevated blood sugar level.  (Tr. at 279).  Dr. Latifi found Rodriguez to be hyperglycemic, still suffering from tinnitus, and still suffering from constipation, which was controlled  through medication.  (*Id.*).

During this period, Dr. Dolan and Dr. Frank Gregg ("Dr. Gregg"), an ophthalmologist, made an RFC assessment of Rodriguez with respect to her vision, because of the earlier diagnosis of glaucoma. (Tr. at 218-25).  On October 31, 2003, Dr. Dolan reported that Rodriguez's glaucoma imposed no exertional, postural, manipulative, or communicative limitations on her, but that her depth perception and field of vision deficits were limiting.  (Tr. at 219-22).  Further, Dr. Gregg found that Rodriguez's activities would be moderately restricted due to the "loss of a large part of [her] upper field" of vision.  (*Id.*).  He stated that, because of this restricted visual field,  Rodriguez's "exposure to [a] dangerous environment (moving machinery, heights, open flames, etc.) should be limited." (Tr. at 221-22).  That RFC concludes, however, that the extent of Rodriguez's limitations, as alleged, "[is] not supported by" the evidence.  (Tr. at 223).

On February 9, 2004, Rodriguez was again examined by Dr. Sunkara, at the state's request. (Tr. at 238).  At that examination, Rodriguez complained of  vision problems, diabetes mellitus II, hypertension, and pain in her right hand, back, and stomach.  (*Id.*).  Rodriguez estimated her level of pain to be "10/10 on a 24/7 basis," particularly in her abdominal area.  (*Id.*).  Dr. Sunkara performed a vision test, and determined that, with corrective lenses, Plaintiff's vision in the right eye was 20/20, and the vision in her left eye was 20/25.  (*Id.*).  Dr. Sunkara found that Rodriguez's abdomen

appeared to be "[s]oft, nontender, no masses or organomegaly."[10]  (Tr. at 239).  She found that,

although Rodriguez's back was not tender, she had "lumbar scoliosis[11] curvatures to right" and a

diminished range of movement.  (Id.).  An x-ray of Rodriguez's lumbar spine showed the following:

> Mild-to-moderate dextrotoscoliosis of lumbar spine.   Multilevel mild disk
> degeneration with moderate spondylosis[12] throughout lumbar spine.   Bones are
> osteoporotic.[13]

(Tr. at 239, 241).  Dr. Sunkara did not detect any abnormalities in Rodriguez's extremities, and found

that she was "[a]ble to pick up and handle small objects, and button and unbutton clothes."  (Tr. at

239).  In the conclusion of her report, Dr. Sunkara made the following assessment:

> 1.  Low back pain with Degenerative Joint Disease—examination nil remarkable.
> 2.  No Hypertension or Hypertensive changes.
>
> She is able to sit, stand and move about.  Her hearing and speech are normal.  ROM
> normal.  Her gait is normal and she had no problems in heel and toe walking.  Her
> grip strength is 5/5 and her ability to reach, handle, finger and feel is preserved.  Her
> strength and coordination are normal in hands and there is no loss of motion.  Her
> current weight-bearing status is good.  She has no varicosities or recurrent ulceration.

(Id.).

On February 10, 2004, Dr. Mark Lehman, Ph.D. ("Dr. Lehman"), a psychologist, and William

Guerrero, MA, a Licensed Psychological Associate, interviewed Rodriguez on behalf of the state.

(Tr. at 243-49).  Following the interview and a review of her medical records, they evaluated her

---

[10] "Organomegaly" is characterized by an "abnormal enlargement of an organ, particularly an organ of the abdominal cavity."  Id. at 1157.

[11] "Scoliosis" is characterized by a "lateral curvature of the spine."  Id. at 1460.

[12] "Spondylosis" is defined as a "stiffening or fixation of [the vertebra] as the result of a disease process." STEDMAN'S MEDICAL DICTIONARY 90, 1678 (27th ed. 2000).

[13] "Osteoporotic" refers to bone that is losing density.  See MOSBY'S at 1169-70.

mental status. (Tr. at 243). Dr. Lehman noted that Rodriguez's "gait appeared slow upon casual inspection," and that "[f]ine motor dexterity was mildly impaired on the right hand." (*Id.*). In addition, he reported that "Ms. Rodriguez's ability to complete tasks timely and appropriately appears to be slightly compromised by her medical condition." (Tr. at 245). He did not, however, find that she experienced episodes of decompensation, and reported that her "condition appears to have been stable for many years." (*Id.*). Dr. Lehman concluded that "Ms. Rodriguez's affect was appropriate" during the evaluation, and that her mood was "normal." (Tr. at 246). He saw no evidence of "loss associations, tangential thinking or circumstantiality," "delusions, obsessions, persecutions or paranoia," or "hallucinatory experiences." (*Id.*). Dr. Lehman also found that Rodriguez's "[s]ensorium appeared clear,"[14] that she was not confused, that she was "fully oriented to person, place and time," and that her "[c]oncentration was good." (*Id.*). He did note, however, that her "[m]emory functions were limited." (*Id.*). Dr. Lehman estimated Rodriguez's intelligence to be "Low Average," and he assigned her a Global Assessment of Functioning ("GAF") score of 60.[15] (Tr. at 247). Ultimately, Dr. Lehman diagnosed Rodriguez as suffering from a "Mood Disorder Due to General Medical Condition." (*Id.*). He added that "[p]rovided Ms. Rodriguez receives psychiatric treatment and complies with her medications, her depression will likely improve over time." (*Id.*). With his evaluation, Dr. Lehman also completed a Psychiatric Review Technique Form ("PRTF") to

---

[14] In psychology, the "sensorium" is "the part of the consciousness that includes the special sensory perceptive powers and their central correlation and integration in the brain." *Id.* at 1467. "A clear sensorium conveys the presence of a reasonably accurate memory together with a correct orientation for time, place, and person." *Id.*

[15] The GAF scale is used to rate "overall psychological functioning on a scale of 0-100," with 100 representing "superior functioning." AMERICAN PSYCHIATRIC INSTITUTE, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS ("DSM-IV") 32 (4th ed. 1994). A GAF score of 51-60 indicates "[m]oderate symptoms (*e.g.*, flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (*e.g.*, few friends, conflicts with peers or co-workers)." *Id.* at 34.

submit to the SSA. (Tr. at 250-63). In the PRTF, Dr. Lehman cited SSA Listing 12.04, for affective disorders, but found that Rodriguez did not meet this listing, nor suffer from any "severe" mental impairment. (Tr. at 250). Dr. Lehman found further that Rodriguez was not limited in her "activities of daily living," and was only mildly limited in "social functioning" and in "maintaining concentration, persistence, or pace." (Tr. at 260). He reported also that Rodriguez is "able to cook, do household chores, shop, and manage her finances," and that she drives a car. (Tr. at 262). Dr. Lehman concluded that Plaintiff's "alleged severity of mental limitations is not fully supported by [the evidence of record]." (*Id.*).

On March 4, 2004, Dr. Terry Collier ("Dr. Collier") performed a physical RFC assessment based on Rodriguez's complaints of lower back pain. (Tr. at 264-71). Dr. Collier listed low back pain with degenerative disk disease as his diagnosis of her condition. (Tr. at 264). Dr. Collier found that Rodriguez could lift 50 pounds occasionally, could lift 25 pounds frequently, and that she could sit, stand, or walk for six hours in an eight hour work day, and that she could push or pull without any restrictions. (Tr. at 265). He found no evidence that Rodriguez had any postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 266-68). Dr. Collier concluded that the "[a]lleged severity of physical limitations is not fully credible based on the [evidence of record]," and explained that, in his opinion, Rodriguez's condition was as follows:

> [claimant] able to sit, stand, and move about. Normal gait. Hearing and speech are normal. [Range of motion] normal, no problem with heel and toe walking. Grip strength 5/5, and ability to reach, handle, finger, and feel is preserved. Normal strength in hands and no loss of motion. Weight bearing status good. CN's intact.
>
> Back: nontender with lumbar scoliosis curvatures to [right]. [Range of motion] diminished. No muscle spasms, or atrophies. [Costovertebral angle] nontender. [Straight leg raises] normal bilaterally.

> Heart sounds regular, no murmur, or gallops.  EKG:  Normal sinus rhythm, non-
> specific T-wave changes.  BP:  122/56, WT:  131 lbs., vision R 20/20, L 20/25
> corrected.  Abdomen:  Nontender, no masses, or organomegaly.

(Tr. at 269).

On July 20, 2004, Rodriguez went to Ben Taub for a hearing evaluation.  (Tr. at 288-90).

Following the evaluation, Melinda Snelson, M.S., CCC/A ("Ms. Snelson"), an audiologist, reported

that Rodriguez had "[m]ild to moderate sensorineural hearing loss" in both ears, and recommended

that she be evaluated for hearing aids.  (Tr. at 288).  On November 17, 2004, Rodriguez returned for

a second hearing evaluation, and was again diagnosed with a hearing loss.  (Tr. at 287).

### Educational Background, Work History, and Present Age

At the time of the hearing, Rodriguez was 57 years of age, with the equivalent of a fifth grade

education.[16]  (Tr. at 321).  Rodriguez testified that her work history included jobs as a food

assembler, a buffet-line attendant, a fast food worker, and an office janitor.  (Tr. at 322-23, 330).

### Subjective Complaints

In her applications for disability benefits, Plaintiff stated that she is unable to work because

of "problems with [her] stomach"; insomnia; weakness; fatigue; a broken wrist; arthritis; glaucoma;

partial blindness; borderline diabetes; pain in her lower back and legs; stress; high blood pressure;

depression; anxiety; nervousness; and "borderline intellectual functioning." (Tr. at 98, 119, 121, 127-

29).  Plaintiff also completed a "pain report", in which she claimed to have "continuous" and "aching"

pain in her right wrist that "is very severe and intolerable and worsens with movement."  (Tr. at 80).

---

[16]  Rodriguez was born, educated, and lived in El Salvador until she immigrated to the United States when
she was approximately 33 years old.  (Tr. at 245).  At the hearing, she testified that she could read and write "very
little" in the English language, but that she was literate in Spanish.  (Tr. at 322, 329).  A Spanish language interpreter
was provided to assist Rodriguez at the hearing before the ALJ.  (Tr. at 317).

She stated that she took Tylenol to relieve the pain, but that it exacerbated her stomach problems. (Tr. at 81, 127). Plaintiff also reported that she had difficulty grabbing or lifting anything with her right hand because of this pain. (Tr. at 95). Rodriguez stated that, on an average day, she cleaned her house and studied English. (Tr. at 119). In a supplement to her application, however, she stated that she needed her husband's help to do household chores and to tend to her personal care. (Tr. at 128). A review of Plaintiff's original applications, and the series of supplements that she provided, shows that she reported her ability to perform daily activities has diminished substantially over time. (*See* Tr. at 65-135, 292-305).

At the hearing, Rodriguez testified that she feels "very ill," much of the time. (Tr. at 324, 327-28). She also told the ALJ that she does not "have any strength in general," explaining "[t]he strength goes away from me." (Tr. at 324). In addition, she testified that pain in her right wrist, arm, and shoulder, as well as an inability to keep her neck straight, make it difficult for her to perform the actions required in her former occupations. (*Id.*). Rodriguez testified that, because of her constant pain, she cannot lift or carry anything in her right hand, but instead has to use both hands to lift, and then use her chest or stomach for support. (Tr. at 325-26). She testified that she can pick up a pen and she can write for approximately 15 minutes without having to stop. (Tr. at 326-27). Rodriguez also testified that her mental state and her constipation make it difficult for her to work. (*Id.*). She complained of headaches, stress, and nervousness. (Tr. at 324-25). Plaintiff testified, as well, that she "cannot see properly," and elaborated:

> If I take off my glasses I can see things from very near, and with my right lens, the lens of my right that goes over my right eye, I can see a bit better at a distance.

(Tr. at 327).  She denied having double vision.  (*Id.*).  Rodriguez told the ALJ that she does drive, but "[o]nly when it's necessary." (Tr. at 329).  She testified that she watches television and reads, but that she often has to stop these activities because her eyes tire and begin to water.  (*Id.*).

### Expert Testimony

At the hearing, the ALJ also heard testimony from Byron Pettingill, a vocational expert witness. (Tr. at 317).  Mr. Pettingill based his opinion on the records submitted and the testimony at the hearing. (Tr. at 330).  Mr. Pettingill classified Rodriguez's former work as a line server and as a worker at a fast food restaurant as light, unskilled labor. (Tr. at 331).  He classified her work as a janitor as medium, unskilled labor.  (*Id.*).  He testified further that Rodriguez's work as a cook, which he believed was more akin to work as a food assembler, was a light, semi-skilled job.  (*Id.*).  He also reported that Rodriguez had no acquired skills which could be transferred to a sedentary job. (Tr. at 332).  Following Mr. Pettingill's conclusion, the ALJ then posed the following hypothetical question to him:

> Q      So if we have an individual the same age, education and vocational history as this claimant, is limited to light work.  That is can occasionally lift or carry 20 pounds, frequently lift and carry 10 pounds.  Stand and/or walk with normal breaks throughout six hours in an eight-hour work day. Sit with normal breaks for six hours in an eight-hour workday. The individual also needs to avoid hazards such as heights and open machinery.  Would that leave any of the claimant's past relevant work?
>
> A      Yes, sir, in my opinion it would.
>
> Q      Which jobs?
>
> A      The work -- her restaurant work, Your Honor, as a food assembler and a line server and her fast food work.
>
> Q      Okay.

(*Id.*).  On cross-examination, Rodriguez's attorney referred Mr. Pettingill to  Dr. Riley's report,

which includes the diagnosis that Plaintiff was suffering from myasthenia gravis, a muscle weakening

disorder, and could only work 25 hours a week.  (Tr. at 274, 333).  Mr. Makris then asked:

> Q       . . .  If you were to assume that an individual had the limitations described in
> that document, would that individual be able to perform the past relevant work that
> you described, or any other jobs that are competitive employment?
>
> *     *     *
>
> A       . . .  With these limitations it's obvious that a person couldn't work in a full-
> time competitive capacity, counsel.
>
> Q       Okay.  Thank you, sir.

(Tr. at 333).

Following the testimony, the ALJ offered Plaintiff the opportunity to summarize her claim.

(Tr. at 334).  In doing so, her attorney emphasized that Dr. Riley's assessment of Plaintiff's condition

is the only RFC  that was made by a treating or examining physician.  (*Id.*).  He argued that Dr.

Riley's assessment  "would give the claimant at best a sedentary RFC, although, it's actually more

into a less than sedentary RFC."  (*Id.*).  He continued his argument as follows:

> So if the Court were to find those restrictions were credible or even find that a
> sedentary RFC would be warranted, the claimant would grid at -- I believe it would
> be 1.02, given that the claimant did have a limited education and is illiterate.  And, and
> [sic] that would even assume the claimant did have some semi-skilled work and that's
> no transferability, so, we would satisfy to a 1.02 with the alleged onset date for it.

(Tr. at 335).

### The ALJ's Decision

Following the hearing, the ALJ made written findings on the evidence.  From his review of

the record, he determined that Rodriguez has degenerative disk disease and glaucoma, and that these

19

conditions are "severe." (Tr. at 20). He also found, however, that Rodriguez does not have an impairment, or any combination of impairments, which meet, or equal in severity, the requirements of any applicable SSA Listing. (Tr. at 18). Ultimately, he concluded that Rodriguez can resume her previous work as a line server, a fast food worker, or a food assembler. (Tr. at 21). With that conclusion, he denied Rodriguez's applications for both DIB and SSI benefits. (*Id.*). That denial prompted Rodriguez's request for judicial review.

Rodriguez complains that the ALJ erred because he failed to "give adequate consideration to the Plaintiff's pronounced peripheral field loss, either as to its severity or its functional implications." (Plaintiff's Motion at 4). Added to that claim is the complaint that "[t]he ALJ erred in failing properly to develop the case with regard to Plaintiff's visual impairment." (*Id.*). In particular, she argues that the ALJ should have ordered a current ophthalmologic examination. (*Id.* at 6). Rodriguez also contends that the ALJ should have found that her wrist and mental impairments were severe. (*Id.* at 8). She next argues that the ALJ compounded his errors because he did not analyze the functional limitations that might be posed by her other impairments, which he found are not severe. (*Id.* at 7). Further, she claims that the ALJ failed to pose to the vocational expert witness a complete hypothetical question, and did not include all of her medically determinable impairments in the question he did ask. (*Id.* at 7-8). In conclusion, Rodriguez argues that the ALJ's decision is not supported by substantial evidence, and that he did not apply the proper legal standards in denying her claims. (*Id.* at 1).

It is well settled that judicial review of the ALJ's decision is limited to a determination of whether the decision is supported by substantial evidence, and whether the ALJ applied the proper legal standards in making it. *See Myers*, 238 F.3d at 619; *Newton*, 209 F.3d at 452 (citing *Brown*,

20

192 F.3d at 496).  Any conflict in the evidence is to be resolved by the ALJ, and not the court.  *See id.*  A finding of "no substantial evidence" is proper only if there are no credible medical findings or evidentiary choices that support the ALJ's decision.  *See Johnson*, 864 F.2d at 343-44 (quoting *Hames*, 707 F.2d at 164).  Here, from the record as a whole, it is evident that the ALJ's decision is supported by substantial evidence.

Plaintiff's first complaints involve her alleged visual disability.  She complains that the ALJ should have given more consideration to her peripheral vision loss, "either as to its severity or its functional implications."  (Plaintiff's Motion at 4).  It is true that the ALJ did not discuss her visual impairment in detail.  However, there is ample evidence in the record to support his conclusion that her vision deficit is not as debilitating as alleged.  In March 2003, Plaintiff was referred to an ophthalmologist because signs of glaucoma were detected.  (Tr. at 226, 330).  Dr. Garcia then performed a series of tests in April 2003, and again in July 2003.  (Tr. at 198-208).  It appears that Plaintiff's vision worsened between these two appointments.  (*Id.*).  However, later records report that she wears glasses to correct her vision, and, in February 2004, Dr. Sunkara reported that, with corrective lenses, Rodriguez's right eye vision was 20/20, and her left eye vision was 20/25.  (Tr. at 232, 238, 269).  Further, at the hearing, Plaintiff acknowledged that she wears glasses and that these improve her sight.  (Tr. at 327).  In October 2003, in a physical RFC assessment, Dr. Gregg, another ophthalmologist, conceded that Rodriguez's glaucoma imposes limitations on her depth perception and that she suffers from the "loss of a large part of [her] upper field" of vision.  (Tr. at 221).  Even with these findings, however, Dr. Gregg determined that Rodriguez's vision problems only "moderately restricted" her activity, although she should avoid dangerous environments.  (Tr. at 221-22).  Moreover, Plaintiff has consistently driven a car, and she testified at the hearing that she still

21

reads. (Tr. at 245, 325-29). Clearly, there is substantial evidence in the record to support the ALJ's conclusion that Plaintiff's visual impairment is not as severe as alleged.

Next, Rodriguez argues that the ALJ did not fulfill his duty to develop the record fully with respect to her visual impairments. (Plaintiff's Motion at 4-6). On this point, she contends that the ALJ should have ordered another ophthalmologic examination from a consulting physician. (*Id.* at 6). It is well established that, in determining whether a disability exists, an ALJ "owe[s] a duty to a claimant to develop the record fully and fairly to ensure that his decision is an informed decision based on sufficient facts." *Brock v. Chater*, 84 F.3d 726, 728 (5th Cir. 1996) (citing *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984)). If he fails to do so, his decision is not supported by substantial evidence, and is subject to reversal if the error results in prejudice to the claimant. *Newton*, 209 F.3d at 456-57; *Ripley*, 67 F.3d at 557. Here, however, the ALJ had ample evidence before him, and a noticeable absence of support from Plaintiff's treating physicians on her level of impairment. In addition, the record is replete with evidence that Plaintiff still engages in routine activities despite her visual limitations, including reading, writing, and driving, and that she wears glasses which help her to see. Further, a reversal is not warranted unless a plaintiff can show that she was prejudiced by the ALJ's error in not developing the record. *See Newton*, 209 F.3d at 459 (quoting *Hall v. Schweiker*, 660 F.2d 116, 119 (5th Cir. 1981)); *Brock*, 84 F.3d at 727. To establish prejudice, a plaintiff must show that she "could and would have adduced evidence that might have altered the result." *Id.* Here, Plaintiff has made no such showing. And it is worth noting that her attorney, who supplemented the hearing record with additional evidence and who actively participated before the ALJ, did not suggest that another Ophthalmologic exam would be helpful before the decision to deny benefits was made.

In short, Plaintiff has not demonstrated that she has been prejudiced, and, on this record, a reversal of the ALJ's decision is not warranted.

Rodriguez also alleges that the ALJ erred when he determined that her wrist and back pain, as well as her "mental impairment(s)," are not severe.  (Plaintiff's Motion at 8).  "A severe impairment is defined in the Regulations as one which significantly limits an individual's physical or mental ability to meet the basic demands of work activity."  *Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000) (citing 20 C.F.R. § 404.1520(c)).  The medical evidence here, however, simply does not support a finding that any of these claimed impairments are "severe."  First, while Rodriguez contends that she has a "severe" wrist impairment, the record is clear that this alleged impairment stems from an injury in 2001, which has fully resolved.  (Tr. at 217).  Her doctor, Dr. Pineda, determined that she had fractured her right wrist in a fall, and he prescribed pain relievers.  (*Id.*).  Less than two weeks after the accident, Dr. Pineda found that Rodriguez had a good range of motion in her right hand.  (Tr. at 214).  Likewise, Dr. Sunkara, who examined Plaintiff in September 2002, and again in February 2004, found that Plaintiff's range of motion was normal.  (Tr. at 171-72, 238-41).  Dr. Sunkara also noted that Plaintiff was able to "reach, handle, finger and feel" with both hands, and that her strength and coordination were normal.  (Tr. at 239).  In fact, the record holds no objective medical evidence to the contrary.

Plaintiff's complaints of disabling back pain are also belied by the evidence.  Following both examinations of Rodriguez, Dr. Sunkara reported that Plaintiff's deep tendon reflexes, range of motion, coordination, gait, and sensory and motor functioning were normal, that her cranial nerves were intact, and that she showed no muscle atrophy.  (Tr. at 172, 239).  She also observed that, although an x-ray showed "mild disk degeneration with moderate spondylosis throughout [her]

23

lumbar spine," Plaintiff was nevertheless "able to sit, stand and move about." (Tr. at 239-41).  This evidence is sufficient to support the ALJ's findings with regard to her back pain.

Finally, Plaintiff points to nothing in the record to support her contention that her "mental impairment(s)" are severe.  In his decision, the ALJ recognized that Plaintiff had a history of complaints of depression or a mood disorder. (Tr. at 17).  The record shows that, in February 2004, Dr. Lehman evaluated Rodriguez's mental state, and found that she had no difficulties in her activities of daily living, her social functioning, her ability to complete tasks timely, and appropriately, and she had no prior episodes of decompensation. (Tr. at 243-49).  Dr. Lehman diagnosed Rodriguez as suffering from a "Mood Disorder Due to General Medical Condition," but based on his observations, and a review of the available medical records, he concluded that her condition would likely improve with treatment. (Tr. at 247).  In his PRTF, Dr. Lehman concluded that the "alleged severity of mental limitations is not fully supported by [the evidence of record]." (Tr. at 262).  Plaintiff points to nothing in the record that contradicts this finding, and has made no showing that the ALJ erred in finding that her wrist pain, back pain, and mental condition were not severe impairments.

In addition, Plaintiff argues that the ALJ erred because he failed to "consider the combined effects of all impairments without regard to whether any such impairment, if considered separately, would be of sufficient severity." (Plaintiff's Motion at 6).  It is well-settled "that in making a determination as to disability, the ALJ must analyze both the 'disabling effect of each of the claimant's ailments' and the 'combined effect of all of these impairments.'" *Fraga*, 810 F.2d at 1305 (quoting *Dellolio v. Heckler*, 705 F.2d 123, 128 (5th Cir.1983)); *accord Loza*, 219 F.3d at 393.  It is also clear that "the ALJ must consider all the record evidence and cannot 'pick and choose' only the evidence that supports his position." *Id.*  It is true that, in this instance, the ALJ did not discuss, in detail, the

combined effect of Rodriguez's impairments each time he addressed a claimed disability.  However, it is evident from the record, as a whole, that the ALJ did carefully consider the combined effect of Rodriguez's impairments before issuing his decision.  He discussed each alleged impairment and the relevant evidence, including Plaintiff's subjective complaints, at numerous points in his written decision.  (*See* Tr. at 17-20).  From those resources, he concluded that Plaintiff does not have an impairment or combination of impairments that meets or equals in severity the requirements of any of the medical listings.  (Tr. at 18).  In an earlier appeal from a SSA decision, the Fifth Circuit found that an ALJ did not err in evaluating each claimed disorder individually, without discussing the cumulative effect of the claimant's impairments each time he addressed a different impairment.  *See Owens v. Heckler*, 770 F.2d 1276, 1282 (5th Cir. 1985).  On this record, Plaintiff has not shown that the ALJ failed to consider the combined effect of her impairments.

Plaintiff also argues that the ALJ failed to weigh Dr. Riley's opinion appropriately in determining her residual functional capacity.[17]  Rodriguez notes specifically that Dr. Riley diagnosed her as suffering from myasthenia gravis, a neurological disorder, and found that she is capable of working on a part-time basis only.  (Tr. at 274).  In fact, at the hearing, Plaintiff's attorney argued that Dr. Riley's RFC is the only opinion from any physician who had actually examined Rodriguez.  (Tr. at 334-35).  While that may be true, the law is clear that the determination of a claimant's RFC is the responsibility of the ALJ.  *See* 20 C.F.R. §§ 404.1545; 416.945; *Ripley*, 67 F.3d at 557.  Further, in this circuit, the law is equally clear "that, although the opinion of an examining physician is generally entitled to more weight than the opinion of a non-examining physician, the ALJ is free

---

[17] "The term 'residual functional capacity' is defined as the most an individual can still do after considering the physical and mental limitations that affect the ability to perform work-related tasks." *Ray v. Barnhart*, 163 Fed. Appx. 308, 312 n.6 (5th Cir. 2006) (citing 20 C.F.R. § 416.945(a)(1)).

to reject the opinion of any physician when the evidence supports a contrary conclusion." *Bradley v. Bowen*, 809 F.2d 1054, 1057 (5th Cir. 1987) (quoting *Oldham v. Schweiker*, 660 F.2d 1078, 1084 (5th Cir. 1981)). Here, the ALJ devoted two lengthy paragraphs in his written decision to Dr. Riley's findings, and he listed several factors that weigh against giving the report controlling weight. (Tr. at 18-19). First, the ALJ noted that Dr. Riley failed to identify how long he had treated Rodriguez, nor did he "identify any neurologic or other clinical deficits that would support his opinion." (Tr. at 18). Further, the ALJ found that Dr. Riley had not been shown to have any expertise which would qualify him to make an RFC assessment. (*Id.*). Finally, the ALJ pointed out that Dr. Riley's conclusions and diagnosis are not even suggested in the reports from any other doctor. (Tr. at 19). On this evidence, the ALJ was justified in not giving controlling weight to Dr. Riley's opinions.

Plaintiff's final complaint is that the ALJ failed to pose complete hypothetical questions to the vocational expert witness. (Plaintiff's Motion at 7-8). It is true that, to support a non-disability finding, any hypothetical question that is posed to a vocational expert witness must "incorporate reasonably all disabilities of the claimant [that are] recognized by the ALJ" and that are supported by the objective medical evidence. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001); *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994); *see Carey v. Apfel*, 230 F.3d 131, 145 (5th Cir. 2000); *Morris v. Bowen*, 864 F.2d 333, 336 (5th Cir. 1988). And, if hypothetical questions to the vocational expert witness do not fairly encompass all of the claimant's limitations, then the witness's response does not constitute substantial evidence to support the ALJ's decision. *See Boyd*, 239 F.3d at 707 (citing *Bowling*, 36 F.3d at 436). However, the claimant always has the opportunity to ask questions of the vocational expert witness, and, if necessary, to cure any defects in a purportedly flawed hypothetical question. *See Menchaca v. Barnhart*, 179 Fed. Appx. 215, 218 n.10 (5th Cir. 2006)

(citing *Morris*, 864 F.2d at 335-36); *Perez v. Barnhart*, 415 F.3d 457, 463 (5th Cir. 2005). In this case, it is not at all clear that the ALJ erred in his questions to Mr. Pettingill, given that there is little evidence to support the notion that Plaintiff's other claimed limitations, alone or in combination, had any real effect on her ability to work. It is clear, however, that her attorney took the opportunity to pose his own hypothetical questions to the expert witness at the hearing. (Tr. at 333-35). In doing so, however, he posed only one hypothetical question which incorporated Dr. Riley's findings, without reference to the other limitations he now claims were erroneously omitted. Plaintiff cannot now claim that she was prejudiced by an incomplete hypothetical question from the ALJ. *See Brock*, 84 F.3d at 727.

As a final matter, the ALJ found that Rodriguez's own testimony on her impairments "was only partially credible and not fully consistent with the record considered as a whole." (Tr. at 20). It is true that in any disability determination, the ALJ "must consider a claimant's subjective symptoms as well as objective medical evidence." *Wingo v. Bowen*, 852 F.2d 827, 830 (5th Cir. 1988). But there is no question that an ALJ has discretion to weigh the credibility of the testimony presented, and that his judgment on what weight to ascribe to it is entitled to considerable deference. *See Villa*, 895 F.2d at 1024. An ALJ may accept or reject a claimant's subjective statements, so long as the reasons for so doing are made clear. *See Falco*, 27 F.3d at 164. For example, he may find that the claimant's subjective complaints are "not credible," or he may find the medical evidence to be "more persuasive than the claimant's own testimony." *Id.* "[A claimant's] subjective complaints must be corroborated at least in part by objective medical testimony." *Houston v. Sullivan*, 895 F.2d 1012, 1016 (5th Cir. 1989) (citing *Harrell*, 862 F.2d at 481); *accord* 20 C.F.R. §§ 404.1528(a), 404.1529. If there are conflicts between a claimant's subjective complaints and the objective medical evidence,

27

the ALJ must evaluate the claimant's credibility. *See* 20 C.F.R. § 404.1529; *Hollis v. Bowen*, 837

F.2d 1378, 1385 (5th Cir. 1988). In doing so, the ALJ must consider such factors as stated activities

of daily living, current treatment, medication and any side effects, or other methods of alleviating

pain, to determine the limiting effects of any impairment or symptomology on the claimant's ability

to work. *See* 20 C.F.R. § 404.1529; *Hollis*, 837 F.2d at 1385. In Rodriguez's case, the ALJ found

no evidence that she was ever treated with more than "mild to moderate over the counter pain

relievers," or that any physician had recommended that she use a device to help her walk. (Tr. at 19).

As to her visual impairment, the record shows clearly that Plaintiff wears glasses that improve her

eyesight, and she has never abandoned her license to drive. (Tr. at 232, 238, 269, 327). Further,

Plaintiff testified that she can still perform some household chores, that she reads regularly, that she

can hold a pen and write, and that she drives a car. (Tr. at 325-29). The ALJ also cited numerous

medical records that show that Plaintiff has a normal gait and full muscle strength, no muscle atrophy,

an adequate range of motion in her right wrist, and is not limited by her mental condition. (Tr. at 17-

20). Because there is ample evidence to support the ALJ's conclusion that Rodriguez's limitations

were not as severe as she alleged, his finding that her subjective complaints were not fully credible

need not be disturbed. *See* 20 C.F.R. § 404.1529; *Hollis*, 837 F.2d at 1385.

  In sum, the ALJ's decision to deny disability benefits to Rodriguez was supported by

substantial evidence, and was rendered in accordance with the law governing her claims. For that

reason, Defendant's determination that Rodriguez is not disabled and his consequent denial of SSA

benefits should not be disturbed.

**Conclusion**

Accordingly, it is **RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**, and that Plaintiff's Motion for Summary Judgment be **DENIED**.

The Clerk of the Court shall send copies of the Memorandum and Recommendation to the respective parties, who will then have ten business days to file written objections, pursuant to 28 U.S.C. § 636(b)(1)(c), General Order 02-13, S.D. Texas. Failure to file written objections within the time period provided will bar an aggrieved party from attacking the factual findings and legal conclusions on appeal.

The original of any written objections shall be filed with the United States District Clerk, P.O. Box 61010, Houston, Texas 77208; copies of any such objections shall be delivered to the chambers of Judge Lee H. Rosenthal, Room 11535, and to the chambers of the undersigned, Room 7007.

**SIGNED** at Houston, Texas, this 22nd day of February, 2007.

**MARY MILLOY**
**UNITED STATES MAGISTRATE JUDGE**